**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-11758
Non-Argument Calendar
_____

FRANK REYES,

*Petitioner-Appellant,*

*versus*

FLORIDA DEPARTMENT OF CORRECTIONS,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-60567-RAR
_____

Before NEWSOM, ABUDU, and ANDERSON, Circuit Judges.

PER CURIAM:

Frank Reyes, a Florida prisoner serving a 40-year sentence for second-degree murder, appeals the district court's denial of his

petition for habeas corpus, under 28 U.S.C. § 2254.[1]  We granted Reyes a certificate of appealability on "[w]hether Reyes's trial counsel was ineffective for failing to object to the [trial court's] instruction on the duty to retreat."  After careful review, we affirm the district court's denial of habeas relief.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Reyes, represented by counsel, filed his § 2254 petition in March 2022.  He presented three claims in his petition, including the ineffective assistance claim relevant here, the only claim on which Reyes has received a certificate of appealability.  The state responded to Reyes's petition and argued the district court should deny it.  It conceded that Reyes had exhausted the relevant claim in state court, under 28 U.S.C. § 2254(b) & (c), and that Reyes's petition was timely, under 28 U.S.C. § 2244(d).  However, it disagreed with Reyes's contentions: (i) that his attorney performed deficiently; and (ii) that Reyes suffered prejudice as a result.  *See Strickland v. Washington*, 466 U.S. 668 (1984) (setting out the test for ineffective assistance of counsel claims under the Sixth Amendment).  In support of its position, the state submitted trial transcripts and other documentary evidence from the state court proceedings.

---

[1] In denying Reyes's petition, the district court adopted a report and recommendation ("R&R") prepared by a magistrate judge.  *See Reyes v. Fla. Dep't of Corr.*, No. 22-cv-60567, 2023 WL 3178563 (S.D. Fla. Apr. 11, 2023), *report and recommendation adopted*, 2023 WL 3172551 (S.D. Fla. May 1, 2023).

In July 2008, Reyes was charged with the second-degree murder of Alfredo Cruz. *See* FLA. STAT. §§ 782.04(2), 775.087. The case proceeded to trial.

In its opening statement, the state explained that it would present evidence from a bystander, a medical examiner, police officers, and a recorded interview of Reyes himself explaining what happened. It contended that this evidence, collectively, would show that Reyes committed second degree murder by killing Cruz during a drug deal and that Reyes did not act in self-defense. Reyes's opening statement, on the other hand, asserted that the jury should find "that this [wa]s an act by Mr. Reyes of self-defense, plain and simple."[2]

The state's first witness was Dr. Gertrude Juste, a medical examiner, who testified that Cruz was killed by a "close range gunshot wound." The state next called Detective James Olczak who had interviewed Reyes as a suspect. Detective Olczak explained that Reyes originally denied involvement in the crime. However, Reyes later gave another statement, which was recorded and introduced at trial. The court instructed the jury to consider this recorded statement in the same way it would consider any other evidence.

In this second interview, Reyes stated the following. On June 20, 2008, Reyes was contacted by an individual looking to

---

[2] Reyes confirmed to the trial court that he had discussed his self-defense theory with his counsel, and that he wished to proceed on that defense.

purchase a "dime bag" of marijuana. A car with two men inside whom he did not know arrived at his apartment complex. Reyes approached the passenger door of the car and tried to "bargain" with the men over the marijuana. He handed over the dime bag to Cruz, but Cruz did not pay him. Instead, Cruz mentioned another individual that Reyes had previously fought. Cruz tried to grab Reyes on his left forearm, like he was "going to rough [him] up." Reyes identified a small abrasion on his left forearm caused by the incident. Reyes responded by "put[ting] the gun in [Cruz's] face." He first said that Cruz "rushed at [him]," but then clarified that Cruz acted aggressively toward him but remained seated inside the vehicle, making Reyes feel like he needed to defend himself.

Reyes stated that "it happened so quick" and he "didn't even see when [he] shot him." He had pointed the gun towards the window of the car, which was fully down, and the door was open "like [Cruz] was going to get out" of the car. He explained that Cruz was holding onto his arm when he fired the shot. He then ran away from the vehicle and threw the gun into a lake. The driver of the vehicle was not involved in the shooting. Reyes had brought the gun that night because he felt the circumstances of the drug sale were "weird," including how the vehicle parked at the back of the parking lot rather than where Reyes's buyers usually parked. At the conclusion of the interview, Reyes confirmed that he had been informed of his rights and had agreed to speak without having an attorney present. He also told officers that he was "so sorry," and

repeated that he "wish[ed] it was" him who was shot instead of Cruz.

Detective Olczak testified that he observed the mark on Reyes's arm during his interview. He did not photograph the mark because it was "very minor" and "very faint," so he did not think it would appear in a photograph. The state and Reyes stipulated to several facts, namely that: (1) the ballistic analysis of the bullet recovered from Cruz's body matched the firearm which belonged to Reyes' and (2) there was no DNA or fingerprint evidence linking Reyes to the crime.

The state called Michael Caplan, an emergency room assistant, who testified that Cruz died in the hospital at roughly 11:35 PM from the gunshot wound, and Detective Jason Wilkey, who testified that he arrested Reyes the day after the shooting. Detective Wilkey testified that, when he arrested Reyes, Reyes did not show any apparent signs of having been in a struggle. Another detective, Sean Visners, confirmed that Reyes had initially denied involvement before admitting "it was an accident." Reyes then had explained he had been involved in a marijuana deal, "Cruz snatched the marijuana from him[,] . . . he got scared[,] and then [he] subsequently produced the revolver and then shot Mr. Cruz . . . ." Detective Visners testified that Reyes was "[v]ery remorseful" and "cried continuously." He did not observe any injuries on Reyes during the interview. Another officer, Charles Edel, explained that blood splatter evidence from the scene showed that Cruz was shot while he was seated.

Caban, the driver of the car, was the only eyewitness to the crime. Caban explained that when Reyes handed over the marijuana, Cruz objected that he had requested a "nick bag," which would cost around $5. Caban did not see the two exchange money. Cruz said he could not pay Reyes because they only had $8. Caban testified that Reyes then became upset. Reyes repeated that all he had was a dime bag and requested that Cruz give him his money, repeating "I just want my money, give me my money." Cruz stated that he did not have enough money on him, he only had $8, and was, therefore, $2 short.

During this conversation, Caban explained, the car window was down, the door was closed, and Cruz was seated. Reyes grew increasingly frustrated and reached for his backpack, held it in front of him, and put one of his hands inside. Reyes used both hands to unzip the backpack. He then pulled out a gun and pointed it into the car toward Cruz. Cruz asked Reyes if he was going to shoot him, to which Reyes replied "I'm not" and again requested the $2. The tip of the barrel was slightly inside the window. Cruz did not attempt to get out of the car, and the car door remained closed. Reyes pointed the gun at Cruz for approximately 30 seconds. Caban testified that, when Reyes "realize[d] that he [wa]s not going to get his $2 . . . he pull[ed] the trigger and" ran away from the car. Caban explained he did not see Cruz make any sudden movements nor grab Reyes's arm. He also admitted he had $3 in cash during the whole incident. He conceded that he believed that Cruz had "80 bucks in the car," so he must have been "tr[ying] to hustle" Reyes over two dollars. Caban also testified that he and Cruz had

no weapons whatsoever in their car and he did not get out of the car "to attack" Reyes during the incident.

After Caban testified, the state rested, and Reyes moved for a judgment of acquittal. The trial court denied the motion. Reyes did not testify or present any witnesses. When the parties first discussed the jury instructions—during a recess in trial—Reyes's counsel requested an instruction on self-defense. Counsel explained that, in the state's proposed instructions, "a person is justified in using deadly force when he reasonably believes such force is necessary to prevent" certain things. Counsel explained that he wanted "the court [to] instruct[]," more specifically, that Reyes could use force if he was "in fear of the commission of a forcible felony." To further define "forcible felony," Reyes's trial counsel sought to inform the jury that Reyes was justified in using deadly force if he was "in fear of the commission of a second-degree murder against him as well as in fear of an aggravated battery being committed against him." The court asked whether there would be testimony presented that an aggravated battery was being attempted on Reyes, and Reyes's trial counsel acknowledged that Reyes would have to testify to support the inclusion of aggravated battery. The trial court and the parties agreed to wait to see if the evidence adduced at trial would support that Reyes "was in fear of th[e] commission of an aggravated battery against him." Reyes's counsel confirmed that the remainder of the jury instructions appeared correct. After Reyes rested his case, counsel informed the court that the parties had resolved the issue with the instruction on

self-defense and would not include aggravated battery in the instructions.

In closing, the state noted that Reyes's "defense in this case is self-defense" and the law is "that you may not use deadly force, you may not shoot a gun into the face of another human being unless you, too, feel that you are in imminent danger of great bodily harm or death." All Reyes had been able to show was an "abrasion that may or may not have been there." The state argued, therefore, that Reyes was not in fear of great bodily harm or death. The state conceded Cruz "played . . . or hustled" Reyes but it argued Reyes's conduct was not justified. It also asserted that Reyes's changing stories suggested that his self-defense argument was a post hoc justification for what happened. Reyes's counsel argued that this was a case of justified self-defense, noting that Reyes was outnumbered two to one and that he was much smaller than Cruz and Caban. Counsel also tried to discredit the testimony of Caban, arguing that Caban had not seen whether or not Cruz grabbed Reyes's arm and could not establish that Reyes had not acted in self-defense.

After the closing statements, the court instructed the jury. As relevant here, the court provided fulsome and lengthy instructions on Florida's law of self-defense, which, except one small provision, are not challenged here. The one challenged portion of the instructions reads as follows:

> If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had the right

to stand his ground and meet force with force, includ-
ing deadly force.

Reyes's counsel did not object to the jury instructions. After the
jury deliberated, Reyes was found guilty and was sentenced to 40
years' incarceration. Reyes appealed. On appeal, he argued that:
(i) the prosecutor made improper and prejudicial comments during
closing argument warranting reversal; and (ii) there was insuffi-
cient evidence supporting his conviction. He did not challenge the
jury instructions. Florida's Fourth District Court of Appeal
("DCA") affirmed without opinion. *Reyes v. State*, 81 So. 3d 432
(Fla. 4th DCA 2012) (table).

Reyes moved for postconviction relief in state court under
Fla. R. Crim. P. 3.850(a). He argued his trial counsel was ineffective
for failing to object to legally incorrect instructions on self-defense.
First, he contended that, as read, the jury instructions on self-de-
fense stated that Reyes was only justified in using deadly force if
Cruz had been attempting to murder him. Second, he argued the
"standard 'stand your ground' language" improperly suggested
that he had an absolute duty to retreat because he was engaged in
unlawful activity at the time of the shooting. He also argued coun-
sel was ineffective for failing to preserve these issues for appeal.

Reyes contended that the jury instructions should have ex-
plained that, if he feared for his safety, he was entitled to use deadly
force to prevent Cruz from committing aggravated assault or ag-
gravated battery against him. He argued that, by erroneously in-
structing the jury regarding "murder," the trial court eliminated

the state's burden to prove that he did not act in self-defense. Reyes also argued that the instructions suggested that he had a duty to retreat, even though he did not have an *absolute* duty to retreat under Florida law. He argued that these errors prejudiced him because his right to present a complete defense was violated. The state opposed Reyes's petition, arguing there was no evidence to support the inclusion of aggravated assault or aggravated battery instructions. However, the state did not address the propriety of the "stand your ground" instruction. The state trial court denied the motion "for the reasons contained in the State's Response."

Reyes appealed, arguing that the trial court erred in summarily denying his motion because his claims were not conclusively refuted by the record nor facially invalid; instead, he was entitled to a new trial. He reiterated his arguments from his Rule 3.850 motion, including that the jury instructions negated his defense and gave the jury an incorrect implication that he was required to retreat. The state, in response, argued that its original motion provided adequate grounds for the denial of Reyes's motion. The Fourth DCA affirmed without opinion. *See Reyes v. State*, 205 So. 3d 609 (Fla. 4th DCA 2016) (table).[3]

In his federal § 2254 proceedings, Reyes argued that a defendant, at the time he was tried, was justified in using deadly force if he "ha[d] retreated to the wall or retreat would be futile."

---

[3] Reyes sought state postconviction relief on other grounds not relevant to this appeal, but those efforts were also unsuccessful. *See Reyes v. State*, 328 So. 3d 977 (Fla. 4th DCA 2021) (table).

Therefore, he argued "the correct approach," in crafting the jury instructions would have been to tell the jury:

> If you find [Reyes] was engaging in an unlawful activity or was attacked in a place where he did not have the right to be then you must consider if the defendant had a duty to retreat. If the defendant was in a position of imminent death or great bodily harm and it would have increased his own danger to retreat then his use of force likely to cause death or great bodily harm was justifiable.

He contended that this instruction was more appropriate than the instruction given—which would only be appropriate for defendants who were "not engaged in an unlawful activity and w[ere] attacked in any place where [they] had a right to be"—and that the failure to instruct the jury about the contours of "the duty to retreat for an individual engaged in unlawful activity," prejudiced him by leaving him "without a viable defense."

A magistrate judge prepared an R&R recommending that the district court deny Reyes's § 2254 petition and deny his request for an evidentiary hearing. As to the relevant claim, the magistrate judge concluded that *de novo* review applied. Yet, the magistrate judge reasoned, Reyes's claim failed under *de novo* review on both the deficiency and prejudice prongs of *Strickland*. As to prejudice, the R&R concluded Reyes had not shown a reasonable likelihood that he would have been acquitted if his counsel had objected to the instructions. It explained that, even if the instruction Reyes proposed had been given, Reyes likely still would have been found

guilty because there was no evidence suggesting that "it would have increased his own danger to retreat" based on the facts proven at trial.

Reyes filed timely objections to the R&R. He argued the R&R failed to address whether giving the instruction under these circumstances was erroneous, even if they were not inaccurate statements of the law. He contended he was prejudiced because he was "left without a viable defense" as the instructions did not explain the duty to retreat for someone engaged in unlawful activity. Citing *Dorsey v. State*, 74 So. 3d 521, 527 (Fla. 4th DCA 2011); *Williams v. State*, 982 So. 2d 1190, 1194 (Fla. 4th DCA 2008); and *Richards v. State*, 39 So. 3d 431, 433–34 (Fla. 2d DCA 2010), he also argued that the error was "fundamental" under Florida law, meaning he necessarily suffered prejudice. In the alternative, he asserted that the record showed that a jury could conclude that retreating would have increased the risk to him, also demonstrating prejudice. The state did not object to the R&R.

In May 2023, the district court adopted the R&R, denying Reyes's petition for habeas corpus. The court applied *de novo* review to the relevant claim because the state court never addressed it. However, it agreed with the R&R that Reyes had shown neither deficient performance nor prejudice. As to prejudice, it concluded there was not "a reasonable likelihood" that Reyes would have been acquitted if counsel had objected to the instruction given and requested a different instruction on the duty to retreat, given the record. This appeal followed.

## II. STANDARD OF REVIEW

When reviewing the district court's denial of a § 2254 petition on the merits, we review for clear error the district court's factual findings and its legal determinations *de novo*. *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 907 (11th Cir. 2009). A claim of ineffective assistance of counsel presents a mixed question of law and fact which we review *de novo*. *Calder v. Sec'y, Fla. Dep't of Corr.*, 166 F.4th 1294, 1304 (11th Cir. 2026).

As an initial matter, the district court and magistrate judge properly applied *de novo* review because the state court overlooked the relevant portion of Reyes's claim in the state post-conviction proceedings. *See Johnson v. Williams*, 568 U.S. 289, 303 (2013); *Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003).[4] Accordingly, we review the constitutional issue in Reyes's § 2254 petition *de novo*. *Bester v. Warden*, 836 F.3d 1331, 1336–37 (11th Cir. 2016); *Davis*, 341 F.3d at 1313.[5]

---

[4] Specifically, the Fourth DCA affirmed the state trial court's denial of Reyes's Rule 3.850 motion without explanation. Because the Fourth DCA provided no explanation for its decision, we must "look through" to the last reasoned decision for "a relevant rationale." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). Here, that was the state trial court's denial of Reyes's Rule 3.850 motion "for the reasons contained in the [s]tate's Response." However, the state's response did not address whether Reyes's counsel was ineffective for failing to object to the jury instruction on the duty to retreat, despite Reyes properly raising the claim in his Rule 3.850 motion.

[5] Under our rules, the state has likely waived any challenge to the R&R's conclusion that *de novo* review applies by failing to object to the R&R on this issue. *See* 11th Cir. R. 3-1 ("A party failing to object to a magistrate judge's findings

### III. ANALYSIS

The Sixth Amendment recognizes a criminal defendant's right to effective assistance of counsel. U.S. CONST. amend. VI; *Strickland*, 466 U.S. at 684–86. To succeed on an ineffective-assistance-of-counsel claim, a petitioner must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," we may address only that issue. *Id.* at 697.

To prove prejudice, a defendant must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694. "This standard" is not so stringent as to require "a defendant to show that

_____

or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object."); *O'Neal v. American Shaman Franchise Sys., Inc.*, 166 F.4th 1274, 1281–83 (11th Cir. 2026) (same); *see also Clark v. Sweeney*, 607 U.S. 7, 9 (2025) ("In our adversarial system of adjudication, we follow the principle of party presentation." (quotation and citation omitted)). Moreover, in its brief, the state does not meaningfully advance any argument about why the magistrate judge and district court were incorrect in employing *de novo* review. *Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue . . . ."). Even assuming the state's position were preserved—both below and on appeal—however, the district court and the magistrate judge were correct in applying *de novo* review, as explained above.

it is more likely than not that adequate representation would have led to a better result . . . ." *Thornell v. Jones*, 602 U.S. 154, 163–64 (2024). Instead, a court must assess whether counsel's poor performance has created a "reasonable probability" of a different result that is "sufficient to undermine confidence in the outcome." *Id.* at 164 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). "When a defendant challenges a conviction, the question" in the prejudice analysis "is whether there is a reasonable probability that, absent the errors, the factfinder"—here, the jury—"would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. A court assessing an ineffectiveness claim is to be "concerned with whether . . . the result of a particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696; *see also Harrington v. Richter*, 562 U.S. 86, 104 (2011).

While the magistrate judge and district court addressed both prongs of *Strickland*, we focus our analysis on prejudice. Doing so is appropriate because answering the deficiency question would be more difficult on this record. *See Strickland*, 466 U.S. at 697. Determining whether counsel was deficient would require us to assess whether Reyes's "attorney's actions [we]re sound trial strategy, and thus effective," and, given the lack of evidentiary development of this claim in the state and federal postconviction proceedings, it is unclear why Reyes's attorney did not object to the challenged portion of the instructions and, thus, whether "a reasonable attorney could have taken the same actions." *Harvey v. Warden, Union*

*Corr. Inst.*, 629 F.3d 1228, 1243 (11th Cir. 2011).[6]   However, as to prejudice, Reyes has not shown how, even under *de novo* review, and in light of the totality of the circumstances presented at trial, there is a reasonable probability of a different outcome.  *Strickland*, 466 U.S. at 697.   There is no reasonable chance that the jury would have found that retreat would have increased the danger to him and that his use of deadly force was justified.  *Thornell*, 602 U.S. at 163–64.   Therefore, the district court correctly denied Reyes relief.

As a threshold matter, as the facts above show, Reyes's counsel strenuously argued that Reyes acted in self-defense to the jury.   Moreover, while Reyes now argues that counsel should have objected to the jury instructions, the vast majority of the jury instructions about self-defense are accurate and unchallenged, minimizing any potential prejudice to Reyes.  *See, e.g.*, *Solomon v. Kemp*, 735 F.2d 395, 405 (11th Cir. 1984) ("The crucial inquiry is whether the charge as a whole fairly instructs the jury on the law to be applied."); *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990))).   For instance, the court correctly told the jury that, "in deciding whether [Reyes] was

---

[6] Because of the *de novo* standard of review, and the lack of explanation in the record regarding counsel's strategy, the deficiency prong analysis also presents questions for which an evidentiary hearing might be appropriate.  *See Schriro v. Landrigan*, 550 U.S. 465, 473–75 (2007) (laying out circumstances where evidentiary hearings in § 2254 are appropriate).   Yet, because we can resolve Reyes's petition on prejudice on this record, we need not consider that point.

justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time force was used." In this respect, the instruction Reyes argues should have been given would have been very similar to the instructions already given.

The proposed instruction Reyes argues should have been given states: "[i]f the defendant was in a position of imminent death or great bodily harm *and it would have increased his own danger to retreat* then his use of force likely to cause death or great bodily harm was justified." That instruction would have been more precise than the instruction given—which addresses defendants who are "not engaged in an unlawful activity"—because all agree that Reyes was engaged in unlawful activity at the time of the shooting. Yet, the record shows no indication that the jury would have believed that retreat would have increased the danger to Reyes. *See Pinkey v. Sec'y, DOC*, 876 F.3d 1290, 1302 (11th Cir. 2017) (finding erroneous jury instruction not to be prejudicial) ("Considering all of the evidence presented at trial, we are convinced that the error in the . . . jury instruction did not 'reach[] down into the validity of the trial itself to the extent that [the] verdict of guilty could not have been obtained without the assistance of the alleged error.'" (quoting *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996))). In his statements to law enforcement, which were admitted at trial, Reyes claimed that he was standing outside the parked car in which Cruz was a passenger, and that while Cruz verbally harassed Reyes and grabbed his arm, he did not actually attempt to leave the car or indicate that he had a weapon. Caban testified at trial that Cruz

did not grab Reyes or verbally harass him, nor did Cruz try to leave the car, which was parked and turned off. In fact, Caban testified that Reyes raised the gun at Cruz without Cruz making any threat toward Reyes and pointed the gun at Cruz for approximately 30 seconds before firing. In light of his detailed and lengthy testimony, it is likely that the jury adopted Caban's version of events and rejected Reyes's recorded testimony.

Yet, even under the version of the facts most favorable to Reyes, Cruz grabbed and pulled at Reyes's arm from inside a parked car, after mentioning a previous fight Reyes had been in and refusing to pay an additional $2 for a ten-dollar bag of marijuana. Even taking Reyes's version of events as true, rather than Caban's, there is not a reasonable probability that a jury would have found from this evidence that Reyes was unable to retreat without increasing the danger to himself. The trial evidence showed that the incident occurred in a parking lot and nothing suggested that Reyes was cornered or unable to move freely away from the car; at most, Reyes could have left, but would have had to surrender the disputed $2. As the state argues, there was no evidence that there would have been an increase in the danger Reyes faced—as opposed to monetary loss—if he had tried to retreat.

Reyes's defense also relied on the jury finding that he was in a position of imminent death or great bodily harm in the first place, which was central to Reyes's counsel's closing arguments. Yet, in light of the record as a whole, there is not a reasonable probability that a jury would interpret having one's arm grabbed from within

a parked car as creating fear of imminent death or great bodily harm, even in light of the fact that Reyes was outnumbered and Caban and Cruz were larger than him. Reyes was the only individual armed, Cruz and Caban were seated in the car, and there was no testimony that the other men threatened him or acted aggressively—even crediting Reyes's recorded testimony that he was afraid that Cruz might become violent. Indeed, the testimony of Caban suggested that neither Caban nor Cruz exited the car, and Reyes chose not to retreat because he did not want to lose $2. Reyes also did not testify at trial, and the jury heard that he had not originally asserted that he acted in self-defense when he talked with investigators, which contradicted his recorded interview. *Cf. Jent v. State*, 408 So. 2d 1024, 1028 (Fla. 1981) ("Determining the credibility of witnesses, however, is within the province of the jury.").[7] Therefore, narrowing the duty to retreat for Reyes under the request instruction would not have likely resulted in a different outcome.

The cases Reyes relies on do not change our conclusion. In *Dorsey*, for instance, the Fourth DCA reversed a defendant's conviction and remanded for a new trial because the defendant had requested a special instruction and had not received it. 74 So. 3d 521, 527–28 (Fla. 4th DCA 2011). Yet, the court there did not address *Strickland* prejudice, as the claim was not a claim of ineffective assistance of counsel claim. *See id.* at 528 ("Although the

---

[7] There is also no indication in the record that Reyes would have testified if different jury instructions were given.

defendant's claim of self-defense was arguably weak in this case, he was nevertheless entitled to a proper instruction on the law."). Accordingly, *Dorsey* was answering a different question—whether a defendant was entitled to a certain instruction—than we must answer when assessing the Supreme Court's test for prejudice. *See Thornell*, 602 U.S. at 163–64; *Strickland*, 466 U.S. at 696; *see also Pinkney*, 876 F.3d at 1299–1300 (describing Florida caselaw on instructional errors).[8]

For these reasons, Reyes has not carried his burden to show that "the result of" his trial was "unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. By all indications, the jury considered Reyes's self-defense argument and found it not credible. The variation in the jury instructions would not likely have made

---

[8] The facts at issue in *Dorsey* are readily distinguishable and, moreover, show that the defendant there may have been unable to retreat. *See* 74 So. 3d at 525 ("[I]t was uncontested at trial that the defendant had his back against his vehicle when he was confronted by multiple men, including the victims, Lott and Bunting. The victims had both been drinking and Lott, in particular, was heavily intoxicated. After the defendant and Lott exchanged words, Lott punched the defendant in the face, with Bunting's encouragement, causing the defendant to fall back against his vehicle. Although a jury could reasonably find that the defendant's use of a gun was excessive, thereby negating a finding of self-defense, no evidence was presented that the defendant acted out of ill will, hatred, spite, or an evil intent."). As noted, here, no evidence suggested that Reyes could not have retreated; he was the only individual armed and the other two men remained seated in the car during the whole incident.

a difference to that determination.  Therefore, the district court did not err in denying the § 2254 petition.

## IV. CONCLUSION

For the reasons set forth above, we affirm the district court's denial of habeas relief.

**AFFIRMED.**